77044, 77087. HENDERSON v. KMSYSTEMS, INC. et al.; and vice versa.
(374 SE2d 550)

BIRDSONG, Chief Judge.

This is an appeal from the order of the superior court partially

granting appellee/cross-appellant's motion for summary judgment as to the appellant/cross-appellee's claims based on averred violations of the Georgia Securities Act of 1973 as amended, and as to claims based on averments of fraud in the inducement of appellant/cross-appellee to accept inadequate consideration for his sale of KMSystems' (hereafter KMS) stock to appellee/cross-appellants. The cross-appeal asserts that the trial court erred in granting sua sponte an accounting to appellant/cross-appellee following the above grant of summary judgment as there exists no underlying basis of liability and as appellant/cross-appellee has conducted full and adequate discovery.

Appellant/cross-appellee Timothy Henderson (hereinafter appellant or Henderson) was recruited to join the newly established and closely held KMS corporation, by its sole stockholders, Mr. Robert Moffa and Mrs. Katherine Moffa. Mr. and Mrs. Moffa, as a partial inducement to Mr. Henderson to join KMS, offered him the opportunity to purchase 25 percent of KMS stock, and allegedly offered salary and bonuses equal to that of Robert Moffa. The terms of Henderson's initial contract of employment were never reduced to writing.

In September of 1985, the Moffas elected Henderson to the Board of Directors of KMS and appointed him vice-president. On October 1, 1985, Henderson officially commenced his employment with KMS, and thereafter attended certain Board of Directors meetings, and basically conducted himself as "an integral part of" and as "an owner" of KMS. Henderson sold software, helped client companies address their problems, and developed "the interface that was a key difference between [KMS's] Q-LINK Version One and Q-LINK Version Two . . . a key ingredient in our company."

On March 28, 1986, Henderson exercised his option to purchase 25 percent of the outstanding shares of KMS stock; contemporaneous to this purchase a written stockholders' agreement was executed. The agreement in part contained certain conditions for the repurchase of the stock by KMS upon Henderson's death, retirement or termination of employment. The certificates of stock knowingly purchased by and issued to Henderson contained an express written notice to the effect that the securities were not registered under the Federal or Georgia Securities Acts and could not be sold or otherwise transferred unless the securities were registered.

Between April and the end of June 1986, Henderson discovered that his salary and benefits were to be calculated differently than those of Robert Moffa. He protested this fact to no avail. Nevertheless, Henderson continued to serve as Vice-President and Director of KMS, and did not terminate his business relationship over this disagreement. Over a period of time, certain personality conflicts had developed between Henderson and Katherine Moffa. In September 1986, KMS was attempting to purchase an office building. Allegedly,

after Henderson voiced his objection and stated his preference only to lease a building, the Moffas proceeded with building purchase negotiations and significantly excluded Henderson from this negotiating process. When Henderson learned that the lenders would require that all principals of KMS personally guarantee the building loan, it was agreed between the Moffas and himself that Henderson's stock would be resold to KMS. Thus, Henderson would no longer be a corporate principal and would not be required personally to guarantee the loan. Henderson was assured that he would not be terminated as an employee and would continue to serve as vice-president. Henderson testified that he was promised that certain terms of the stockholders' agreement would control the stock sale, particularly as to the requirement that the value of the stock would be calculated "using generally accepted accounting principles consistently applied." Subsequently, Henderson accepted the KMS offer and stock value calculations of $63,266, sold his stock, and executed a stock repurchase agreement wherein he acknowledged receipt of $63,266 as consideration for the stock sale.

Appellant continued working for KMS; however, in the middle of November 1986, a disagreement arose between Katherine Moffa and Henderson. Thereafter, Henderson was orally notified, by Robert Moffa, that he would have to leave the company. On November 19, 1986, Henderson was sent a formal letter of termination signed by Katherine Moffa as Vice-President of KMS.

In December 1986, appellant Henderson sought the advice of an accountant regarding tax treatment of his KMS stock. Based upon information received from his accountant, Henderson requested certain financial information from KMS regarding the accounting methodology used in calculating the value of his KMS stock. Appellees advised Henderson that he had already been provided with the requested information, and Henderson brought the instant suit on February 17, 1987. Appellees moved for summary judgment, which was granted in part. Appellant then brought this appeal. *Held*:

1. In ruling on a summary judgment motion, the movant bears the burden of showing " 'there is no genuine issue as to any material fact and that (he) is entitled to a judgment as a matter of law.' [Cit.] When, as in the instant case, the movant is the defendant, he has the additional burden of piercing the plaintiff's pleadings and affirmatively negating one or more essential elements of the complaint" (*Corbitt v. Harris*, 182 Ga. App. 81, 83 (354 SE2d 637)) and "the opposing party should be given the benefit of all reasonable doubt, and the court should construe the evidence and all inferences and conclusions arising therefrom most favorably toward the party opposing the motion." *Esco v. Jackson*, 185 Ga. App. 901 (1) (366 SE2d 309). Nevertheless, the testimony of either party is to be construed most

strongly against him, in accordance with the standards of *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27 (343 SE2d 680), where it is self-contradictory, vague or equivocal and without reasonable explanation for this deficiency. *Thacker v. Matthews Tuxedo*, 183 Ga. App. 474 (359 SE2d 231). We will apply these principles in the resolution of the summary judgment issues before us.

2. Appellant asserts that the trial court erred in finding that the stock repurchased by the appellees was not a "security" under the amended Georgia Securities Act of 1973. In essence it is urged that the trial court used an erroneous standard in applying discriminately selected language in the case of *Tech Resources v. Estate of Hubbard*, 246 Ga. 583 (272 SE2d 314), thereby giving undue emphasis to the third prong of the three-prong "investment contract" test of *SEC v. W. J. Howey Co.*, 328 U. S. 293 (66 SC 1100, 90 LE 1244) to the exclusion of other applicable tests. Construing the trial judge's order on its four corners, we are satisfied that he did apply all *relevant* test criteria contained in *Tech Resources* in his resolution of this issue. The problem thus becomes one of determining whether the *Tech Resources* test is a sufficient test to be applied in this case. Historically, Georgia decisions regarding the definition of a "security" have been "significantly influenced by the federal case law." See generally Recent Decisions, 30 Emory Law Journal, Securities Regulation— Security Defined, 1217-1218.

In *Landreth Timber Co. v. Landreth*, 471 U. S. 681 (105 SC 2297, 85 LE2d 692), the Supreme Court addressed the issue whether federal securities laws apply when a business is sold by a transfer of 100 percent of its stock; the Supreme Court concluded that the stock at issue was a "security" within the definition of the Acts. In arriving at its decision, the Supreme Court in *Landreth Timber* used a stock-characterization test: *First*, it was deemed "axiomatic that '(t)he starting point in every case involving construction of a statute is the language itself.'" Id. at 685. The face of the statutory definition "shows that 'stock' is considered to be a 'security' within the meaning of the Acts." Id. at 686. But first, it must be determined whether those purported stock instruments, in fact, "possess 'some of the significant characteristics typically associated with' stock, [cit.], recognizing that when an instrument is both called 'stock' and bears stock's usual characteristics, 'a purchaser *justifiably* (may) assume that the federal securities laws apply.'" (Emphasis supplied.) Id. Those identified characteristics usually associated with common stock are (i) the right to receive dividends contingent upon an apportionment of profits; (ii) negotiability; (iii) the ability to be pledged or hypothecated; (iv) the conferring of voting rights in proportion to the number of shares owned; and (v) the capacity to appreciate the value. Id. The Supreme Court applied the first step of its test and after con-

sidering the "context of the transaction involved" concluded that "[u]nder the circumstances of this case, the plain meaning of the statutory definition mandates that the stock be treated as 'securities' subject to the coverage of the Acts." Id. at 687. In arriving at its conclusion, the Supreme Court distinguished its prior case of *United Housing Foundation v. Forman*, 421 U. S. 837 (95 SC 2051, 44 LE2d 621), by noting that the stock in *Forman* did not bear any of the usual characteristics of common stock above discussed and that under the circumstances of the case "there was *no likelihood that the purchasers had been misled* by use of the word 'stock' into thinking that the federal securities laws governed their purchases." (Emphasis supplied.) *Landreth*, supra at 687.

*Secondly*, the Supreme Court reviewed certain of its prior cases, including *Forman* and *SEC v. W. J. Howey Co.*, 328 U. S. 293, supra, and concluded that these cases applied to investment contract situations or transactions involving "unusual instruments" not easily characterized as "securities." Id. at 690-691. The court noted that the "*Howey* economic reality test" originally was designed to determine whether a particular instrument was an "investment contract" not whether it fits within any of the examples listed in the statutory definition of "security"; however, the *Howey* economic reality test currently applies to general categories of cases where the label "stock" does not hold true, "investment contracts" situations and situations involving an "instrument . . . commonly known as a 'security.' " Id. at 691, n. 5 and accompanying text.

We believe that *Landreth Timber* provides appropriate guidance in resolving issues of whether particular "stock" is a "security" under the amended Georgia Securities Act of 1973. In applying the *Landreth* stock-characterization test to the transaction in this case, we will use a balancing test. The appropriate test to be employed is whether the KMS stock bears such characteristics usually associated with common stock that a purchaser justifiably may assume that appropriate security laws apply. We find that the characteristics of the KMS stock do not justifiably give rise to such an assumption in this case. Particularly, the KMS stock contained a conspicuous notice that substantially impaired both the negotiability of the stock and its ability in the real world of business to be pledged or hypothecated effectively, and also expressly negated any assumption that the securities had been registered under either the Georgia or federal securities act. Accordingly, we find that the KMS stock does not meet the statutory definition of "stock" under either the Georgia or federal securities act.

Next, we must determine whether KMS stock otherwise qualifies as a security within the meaning of OCGA § 10-5-2 (16). The test appropriate for this determination is the *Howey* economic reality test, as that test has been tailored by *Tech Resources* for application

under the Georgia Securities Act, to resolve issues concerning "investment contracts" and any "instrument commonly known as a 'security.'"

Among those factors considered by our Supreme Court in *Tech Resources* were: " 'the touchstone [of a security] is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others'" (*Tech Resources*, supra at 584); "the doctrine that 'form should be disregarded for substance and that emphasis should be on economic reality' when making a determination as to whether or not an instrument is a security" (*Tech Resources*, supra at 585, citing *Dunwoody Country Club v. Fortson*, 243 Ga. 236 (253 SE2d 700)); and, "[i]n order . . . to constitute a securities transaction under the law, there must be an investment, a reasonable expectation of profits, and a reliance on the management of another . . . to bring about the profits" (*Tech Resources*, supra at 585). Applying the *Howey-Tech Resources* economic reality test in toto to the circumstances and context of the KMS transactions, we conclude that the KMS stock did not constitute a "security" under either OCGA § 10-5-2 (a) (16) or federal securities laws.

Moreover, assuming without deciding that the legislature wished to enact some form of the risk capital test, separate in application from the multi-factor *Howey-Tech Resources* economic reality test, we believe that even under such a test, this transaction did not involve the sale or purchase of a "security." For example, in a comprehensive risk capital test, one of the existing requirements is that " 'at the time of the transaction, the buyer is not familiar with the operations of the enterprise or does not receive the right to participate in the management of the enterprise.'" W. J. Carney, Securities Practice—The Law in Ga., § 2-3, citing R. Coffey, The Economic Realities of a "Security"; Is There a More Meaningful Formula?, 18 Wes. Res. L. Rev. 367, 377. Clearly, at the time of the transaction, both the Moffas and Henderson were "familiar with the operations of" KMS, and both the Moffas and Henderson possessed and exercised "the right to participate in the management of" KMS.

It is well settled that " '[a] correct decision of a trial court will not be reversed, regardless of the reasons given therefor.'" *Tony v. Pollard*, 248 Ga. 86, 88 (281 SE2d 557). Accordingly, we find appellant's assertions to be without merit.

3. Appellant asserts, in essence, that a fiduciary relationship existed between Henderson, a minority stockholder, and the Moffas, the majority stockholders, and that consequently the trial court erred by finding that appellant Henderson failed to exercise ordinary diligence since Georgia law provides that even directors can rely upon the financial representations of other directors and employees of a corpora-

tion who are reasonably believed to be reliable and competent in the matters presented.

It is a settled general rule of law "that corporate officers and directors occupy a fiduciary relationship to the corporation and its shareholders, and are held to the standard of utmost good faith and loyalty." *Quinn v. Cardiovascular Physicians*, 254 Ga. 216 (2) (326 SE2d 460); see *Comolli v. Comolli*, 241 Ga. 471, 474-475 (246 SE2d 278); *General Info. &c. Systems v. Sweeney*, 176 Ga. App. 315 (335 SE2d 722).

However in *Lariscy v. Hill*, 117 Ga. App. 152, 154 (159 SE2d 443), this court, citing *King Mfg. Co. v. Clay*, 216 Ga. 581, 586 (118 SE2d 581), opined that " '[a] director in dealing with another stockholder for the purchase of his stock is under the same duties as partners, agents, and other fiduciaries to make a full disclosure of all material facts relative to the value of the corporate property under his control, known to him and unknown to the selling stockholders.' *However, '[a] director in buying (or selling) stock is not under such duty to the corporation or the other directors.'* [Cit.]" The sale of stock in the case sub judice was between co-directors of the corporation. Compare with *Nicholson v. Harris*, 179 Ga. App. 35 (345 SE2d 63).

The cases of *Lewis v. Lewis*, 228 Ga. 703 (187 SE2d 872); *Hogg v. Hogg*, 206 Ga. 691 (58 SE2d 403); and *Union &c. Co. v. Trust Co. Bank*, 143 Ga. App. 715 (240 SE2d 100) are distinguishable. We find *Lariscy* to be controlling. In this case, no evidence or reasonable inferences exist that from the date of appellant Henderson's assumption of KMS corporate duties in October 1985, until his termination therewith in November 1986 was he ever denied access to any corporate financial information which he affirmatively requested to see. In fact, there exists evidence establishing Henderson's access to such information. In view of *Lariscy*, we are satisfied that the trial judge correctly concluded that appellant Henderson's failure to exercise any ordinary diligence in making independent verification of the value of his KMS stock before selling it acts to bar an action based on fraud. As we have already said, "a judgment which is correct will not be reversed merely because the wrong reason is given for granting it." *Reese Realty Co. v. Pal Realty Co.*, 182 Ga. App. 215, 217 (355 SE2d 125); accord *Tony v. Pollard*, supra.

Accordingly, we find appellant's assertion to be without merit. We have considered all of appellant's other enumerations of error and related assertions and find them to be without merit and not warranting discussion.

4. Appellee/cross-appellants assert that it was error for the trial court to grant cross-appellee Henderson an accounting when there was no underlying basis or liability for same and Henderson had an opportunity to conduct full and adequate discovery.

Cross-appellants appear to be laboring under the mistaken belief that the trial judge granted summary judgment in their favor as to *all* claims contained in the cross-appellee Henderson's complaint. However, the trial judge's order was carefully worded to limit grant of summary judgment to certain claims for violations of the Securities Act, for attorney fees related thereto, and as to an action grounded in fraud.

When examining a complaint to determine whether the facts asserted therein state a claim for relief under which the plaintiff may recover, it is not necessary to find that the complaint is perfect in form or that it sets out all of the issues with particularity. It is only necessary that the complaint place the defendant on notice of the claim against him. *Walton v. James & Dean, Inc.*, 177 Ga. App. 77 (1) (338 SE2d 516). If upon reading the complaint the defendant is uncertain as to the nature of the claim of which he has been placed on notice, "[t]he proper remedy for seeking more particularity is by motion for a more definite statement [OCGA § 9-11-12 (e)] at the pleading stage or by the rules of discovery thereafter." *Cochran v. McCollum*, 233 Ga. 104, 105 (210 SE2d 13).

We need not determine precisely what claims in law or equity have been adequately asserted by notice pleading, as at this point that function is best left to be addressed by the trial judge. It is sufficient for resolution *of the issue before us* that the complaint adequately places cross-appellants on general notice of the assertion of a claim, for example, grounded on contract or quasi-contract and that the trial judge has not granted the cross-appellees summary judgment as to either of those types of claims.

Every court in this state has both inherent and statutory authority to control and tailor its orders "so as to make them conformable to law and justice." See e.g., OCGA § 15-1-3 (6). Pursuant to OCGA § 15-6-8 (6), superior court judges also have statutory authority "[t]o exercise such other powers, not contrary to the Constitution, as are or may be given to such courts by law." This grant of power is intentionally broad and clearly includes but is not limited by any means to the authority granted under OCGA § 15-6-3. Moreover, "it is always discretionary with the court in a case involving matters of account to refer it to an auditor." *Mendenhall v. Kingloff*, 215 Ga. 726 (2) (113 SE2d 449). See, e.g., OCGA § 9-7-3.

Cross-appellants have failed to carry their burden of establishing that the trial judge breached her discretion in ordering an accounting. Accordingly, cross-appellants' enumerated error is without merit.

*Judgment affirmed. Banke, P. J., and Beasley, J., concur.*

DECIDED SEPTEMBER 27, 1988 —
REHEARING DENIED OCTOBER 24, 1988.

*Jeffrey L. Sakas*, for appellant.
*Lynn E. Nardiello, Martin M. Pollock*, for appellees.